No. 125,734

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

AUSTIN PROPERTIES, LLC,
*Appellant*,

v.

CITY OF SHAWNEE, KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

1.

Cities and counties may enact broad zoning ordinances and procedures so long as they do not violate state zoning statutes.

2.

State zoning statutes do not prohibit zoning authorities from treating applications for multi-family residential planned unit developments as zoning amendments governed by K.S.A. 12-757.

3.

Zoning authorities are not prohibited from applying the protest provisions of K.S.A. 12-757(f)(1) to multi-family residential planned unit development applications.

4.

When neighbors file a valid protest petition against a zoning amendment pursuant to K.S.A. 12-757(f), the zoning authority can only approve the amendment by a 3/4 majority vote.

1

**5.**

If a zoning authority fails to approve a protested zoning amendment by 3/4 majority vote, the protested zoning amendment is denied, and the processes for resubmission of failed zoning amendments in K.S.A. 12-757(d) are inapplicable.

**6.**

Zoning authorities are strongly encouraged, although not required, to consider and document the factors enumerated in *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 (1978), when evaluating zoning amendments. Zoning authorities may consider some *Golden* factors more important than others and are not limited to the factors enumerated in *Golden* for their zoning decisions.

**7.**

Zoning authorities cannot rely on unsupported generalities or a plebiscite of neighbors when making zoning decisions.

Appeal from Johnson District Court; JAMES F. VANO, judge. Oral argument held August 15, 2023. Opinion filed April 26, 2024. Affirmed.

*Melissa Hoag Sherman* and *Lewis A. Heaven, Jr.*, of Spencer Fane LLP, of Overland Park, for appellant.

*Andrew D. Holder*, of Fisher, Patterson, Sayler & Smith, LLP, of Overland Park, for appellee.

Before WARNER, P.J., GARDNER and HURST, JJ.

HURST, J.: Austin Properties, LLC (Austin) submitted an application to the City of Shawnee (the City) to develop a "high-end" multi-family residential planned unit development on approximately 29 acres near Highway K-7 and Woodsonia Drive. Unfortunately for Austin, an overwhelming number of neighbors filed a protest petition

opposing Austin's application, thus requiring the City to achieve a three-fourths (3/4) majority vote for approval of Austin's application. After failing to achieve the requisite super majority vote for approval, Austin's proposal failed to pass. Austin sought judicial review and the district court upheld the City's decision. Austin now appeals, claiming the district court erred.

Along with determining the reasonableness of the City's decision to not approve Austin's development, this case presents novel questions about the City's application of state zoning statutes to its application process for mixed residential planned unit developments. Ultimately, the broad authority and discretion of zoning authorities supports the City's decisions on each issue. The City may enact zoning ordinances—that are not inconsistent with state zoning statutes—to its application process for planned unit developments for mixed residential use. Although not how most people characterize rezoning, the City is permitted to treat applications for planned unit developments as requests for rezoning and apply statutes and ordinances accordingly. Additionally, this court cannot say the City acted unreasonably when it denied Austin's proposed development. While there is no doubt this court's review, and likely the credibility and reliability of the City's zoning decisions, would benefit from a more complete explanation of its rationale for denying Austin's application, there is sufficient information in the record to demonstrate the reasonableness of the City's decision.

The district court's decision is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

Austin owns 29.2 acres of undeveloped land (the Subject Property) in the 5100 to 5300 blocks of Woodsonia Drive in the City of Shawnee in Johnson County. Most of the Subject Property is bounded by 51st Street to the north, Woodsonia Drive to the east, 53rd Street to the south, and Highway K-7 to the west. A small parcel of the Subject

Property is located just south of 53rd Street. The elevation of the Subject Property declines as it nears Highway K-7.

*The City's 1996 Approved Use for the Subject Property*

J.C. Nichols Company previously owned property that included the Subject Property, and the City granted its rezoning request from agricultural use to planned mixed residential use in 1996. That 1996 rezoning included approval for construction of a multi-family and townhome development of 330 garden level multi-family units in 33 buildings and 68 townhome units in a combination of two-, three-, and four-plex buildings on 44.6 acres. The overall density of the 1996 approved plan was approximately 8.9 dwelling units per acre (du/acre). However, the approved 1996 plan was never developed, and the Subject Property was later acquired by Rodrock Homes (Rodrock).

*The City's 2002 and 2004 Approved Use for the Subject Property*

In 2002, the City approved Rodrock's development plan for the Subject Property which contained 224 townhome units in 57 buildings and 137 single-family cottage units on 43.7 acres. The overall density of Rodrock's plan was approximately 8.3 du/acre. But a subsequent land acquisition and development plan by the State affected the Subject Property and made Rodrock's 2002 plan no longer feasible. In 2004, Rodrock obtained the City's approval for yet another development plan for the Subject Property which contained 314 townhome units in 111 buildings on 43.7 acres, yielding an overall density of approximately 7.2 du/acre. However, later State action also rendered this development plan infeasible. Austin eventually acquired the Subject Property before any development occurred.

*The Current Property Development Dispute*

The Subject Property is currently zoned planned unit development mixed residential use (PUDMR). The land to the north and east of the Subject Property is zoned single-family residential use and contains single-family homes located in the Woodsonia subdivision. Land to the south of the Subject Property is zoned commercial highway use (CH) and PUDMR. The southern land zoned CH is developed with office and retail uses in the Woodsonia West Center, and a newly constructed fire station and under-construction daycare facility are located on part of the southern land zoned PUDMR. The remaining portion of the southern land zoned PUDMR is undeveloped but approved for townhomes.

The City's Future Land Use Map within its Comprehensive Plan (the Comprehensive Plan) designates the Subject Property for development with a mix of high- and medium-density residential uses. The Comprehensive Plan contemplates that the highest density be on the western side of the Subject Property adjacent to Highway K-7 and medium density be on the eastern side next to Woodsonia Drive. The City's Comprehensive Plan defines high-density residential uses as between 10 and 15 du/acre and medium-density residential uses as between 5.01 and 10 du/acre.

In 2019, Austin applied for approval of a new preliminary development plan—the "Woodsonia West Multi-Family Development" (the Woodsonia West Development)—and the necessary "rezoning" of the Subject Property from PUDMR to PUDMR. As explained below, the City defines applications for PUDMR as requests for rezoning or zoning amendments. Austin's Woodsonia West Development spanned 29.2 acres and contained 42 townhome units in 14 triplex buildings and 384 multi-family units in 16 multi-story apartment buildings, yielding 426 units with an overall density of approximately 14.6 du/acre.

5

*The City Planning Commission's Report on Austin's Woodsonia West Development*

The City Planning Commission prepared a staff report (the Report) in which it summarized the impact of Austin's proposed development and found it "should have little, if any, detrimental effect upon the surrounding properties." The Report summarized feedback from the USD 232 School District, which provided there was ample student capacity without changing any boundaries and that "[t]he School District has planned for this type of growth and has indicated it will not negatively affect their services." The City staff relied on Austin's traffic impact study prepared by traffic engineers to conclude that "the street network adjacent to the proposed development is currently well under capacity and the extra traffic generated by the development will have little to no impact on roadway level of service as a result." The City's Transportation Manager reviewed Austin's traffic study and testified at a City Council meeting that he agreed with its conclusions and the routes in and around the neighborhood were "built to handle additional traffic."

The Report ultimately recommended approval of Austin's Woodsonia West Development. The Report explained:

> "Denial of the request would not appear to benefit the health and welfare of the community. The property has been zoned PUDMR for multi-family uses since 1996. Staff believes the proposed development conforms to the Future Land Use Guide of the Comprehensive plan by providing a desirable residential transition/buffer from existing single-family homes to townhomes to multi-family buildings along K-7 Highway. The use of the Planned Unit Development allows for a mixture of differing residential types while governing building materials and site layout to provide a more cohesive, quality development. The development is a high quality plan that provides a variety and mixture of housing stock as a unified, cohesive community. The multi-family uses add to an increase in population needed to help attract and sustain desired restaurants and retail uses.
>
>     . . . .

"Staff is supportive of the project and the efforts the developer has made in creating a quality multi-family plan that provides a variety and mixture of housing stock as a unified, cohesive community. Staff believes the plan conforms to the Future Land Use Guide of the Comprehensive Plan by providing a desirable residential transition/buffer from existing single-family homes to townhomes to multi-family along K-7 Highway. The use of the Planned Unit Development allows for a mixture of differing residential types, while governing building materials and site layout to provide a more cohesive, quality development. The multi-family dwellings create an increase in population, which is needed to help attract and sustain desired restaurants and retail uses in this area of Shawnee.

"Staff recommends approval . . . ."

In November 2019, the Planning Commission held a public meeting where it heard evidence and testimony about Austin's application and it ultimately voted unanimously to recommend approval of Austin's Woodsonia West Development. Following the Planning Commission's recommendation of approval, neighboring property owners filed a protest petition. The City determined the protest petition triggered a requirement that Austin's application required at least a 3/4 majority vote of the City Council for approval. See Shawnee Municipal Code of Ordinances (S.M.O.) § 17.92.030(E)(6).

*The December 2019 City Council Meetings*

The City Council first considered Austin's Woodsonia West Development application at a public meeting on December 9, 2019. After hearing evidence and testimony, the City Council voted to continue the matter for two weeks to allow Austin time to meet and consult neighboring property owners regarding their concerns. Before the next City Council meeting, the City's Community Development Director issued a memorandum outlining Austin's efforts to address the neighboring property owners' concerns and describing the resulting modifications to the proposed development plan.

7

Austin modified the development plan by reducing the number of units from 426 to 413, comprised of 362 apartments and 51 townhomes, thereby decreasing the overall density to 14.1 du/acre.

The City Council again considered Austin's application at its next public meeting on December 23, 2019, and took a vote after receiving evidence and testimony. Four councilmembers—Matt Zimmerman, Jim Neighbor, Mickey Sandifer, and Lindsey Constance—voted to approve Austin's application. Four councilmembers—Eric Jenkins, Mike Kemmling, Stephanie Meyer, and Lisa Larson-Bunnell—voted to deny Austin's application. The City Council therefore advised Austin that its Woodsonia West Development application was not approved because it failed to receive the requisite 3/4 majority vote from the City Council.

*Judicial Review of the City's Denial*

Austin petitioned for judicial review, challenging the City's denial under two general categories: (1) the City Council's decision was unreasonable; and (2) the City Council's decision was invalid because it failed to follow the zoning procedures required by state law. Austin later deposed the four councilmembers who voted against approving its application. Between the two City Council meetings and their depositions, the councilmembers who voted against approval generally identified four reasons for their votes: (1) density; (2) traffic; (3) size and character; and (4) public opposition.

For example, all four councilmembers who voted to deny the application stated in some manner that they believed Austin's Woodsonia West Development was too dense and would negatively impact local traffic. The denying councilmembers also cited concerns that the Woodsonia West Development was incompatible with the neighborhood's character because of its size and design. The councilmembers' specific

statements about their concerns with the Woodsonia West Development are addressed more fully in other parts of this opinion.

In addition, the councilmembers emphasized the overall public opposition to Austin's Woodsonia West Development. At the first City Council meeting, Councilmember Larson-Bunnell said, "To say that this is an unpopular project is an understatement . . . I know that I am not to take popular opinion as the sole deciding factor of this—of my vote and I don't want to give the impression that I am. But I think that that context is important." Councilmember Jenkins likewise stated that "[t]he neighbors were there first . . . I think there's kind of a right to being there first. That gives you certain additional rights." Councilmember Jenkins further elaborated at the second City Council meeting:

> "I've received many, many e-mails on this subject on this particular development. And they've kind of been different than e-mails I've gotten on a lot of other subjects that have been brought before this Council. And the way they've really differentiated from what I normally get from people is that they weren't highly emotionally charged. They weren't screw you, guys, we want this changed. They were very well thought out. And people spent a lot of time analyzing this problem and providing information and data to me. And I read all of them. I'm trying to answer all you guys back. But I did read them all, one by one, and I digested them as carefully as I could. And it still left me with this underlying concern that the density is too great. And I think the one gentlemen [*sic*], you know, it is important that we—that the people have a say-so in this. And that can't be the only consideration. I understand that. That's the way the legal process works. The developer has rights as well as the residents have rights. But I do feel that it certainly is something to take into consideration. It's a significant consideration. And when you have this monolithic opposition as opposed to fractured opposition like, yeah, I like this project, oh, I hate it. I like it. I mean we're not getting that. It's all I hate it. So, that's kind of an unusual bent too that we're having such a steadfast front here that says no, we don't want this impacting our neighborhood. And that has quite an impact on me because something keeps bothering me, something about by and for the people or something like that. And that gives me a lot of concern."

Councilmember Jenkins reiterated his reliance upon public opposition during his deposition testimony: "It was a factor," although "it's not my prime consideration, but it's something that does matter."

Upon competing motions for summary judgment, the district court ultimately granted summary judgment to the City and dismissed Austin's petition with prejudice, reasoning that "the City's denial of [Austin]'s Application was lawful."

Austin now appeals.

## DISCUSSION

Austin appeals the district court's grant of summary judgment to the City, claiming: (1) the City abused its discretion in denying Austin's application; (2) the City violated Austin's due process rights by failing to comply with K.S.A. 12-757(d); and (3) the City violated Austin's due process rights by unlawfully expanding the right to protest under K.S.A. 12-757(f). Before addressing the substantive issue of whether the City's decision to deny Austin's Woodsonia West Development application was reasonable, this court must determine whether the City violated Austin's due process rights during the process.

## I. THE CITY DID NOT DEPRIVE AUSTIN OF ITS DUE PROCESS RIGHTS.

Austin argues the City violated its due process rights by requiring it to submit a rezoning application and permitting protest petitions for the Woodsonia West Development because the Subject Property was already zoned PUDMR. Austin claims this case "involves the wrongful denial of a preliminary development plan, not the rezoning of the Subject Property," and that the City incorrectly relied on the protest petition provisions in K.S.A. 12-757(f)(1). Essentially, Austin argues that because the

Woodsonia West Development was not an application to amend the Subject Property from one type of zoning, such as agricultural, to a different type of zoning, such as residential, the City improperly permitted protest petitions.

This court exercises unlimited review over the interpretation of statutes and ordinances. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019); *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). The most fundamental rule of statutory interpretation "is that the intent of the legislature governs if that intent can be ascertained." *Stewart Title of the Midwest v. Reece & Nichols Realtors*, 294 Kan. 553, 557, 276 P.3d 188 (2012). That review begins with the "plain language of the statute, giving common words their ordinary meaning," and when that plain language is clear and unambiguous this court "refrain[s] from reading something into the statute that is not readily found in its words." *In re M.M.*, 312 Kan. 872, 874, 482 P.3d 583 (2021).

Additionally, the various provisions of a statute or ordinance must be considered *in pari materia*, "to reconcile and bring those provisions into workable harmony, if possible." *Roe v. Phillips County Hospital*, 317 Kan. 1, Syl. ¶ 3, 522 P.3d 277 (2023). This court "must give effect, if possible, to the entire act" and read the provisions "so as to make them consistent, harmonious, and sensible." *State v. Bee*, 288 Kan. 733, Syl. ¶ 4, 207 P.3d 244 (2009).

A. *The City has the authority to enact broad zoning ordinances and procedures.*

The first part of Austin's due process claim is that the City illegally allowed "protest petitions outside of zoning amendments that altered and changed the zoning of real estate." Austin claims the phrases "rezoning" and "zoning amendment" in K.S.A. 12-757 only apply to requests to change a property's zoning designation for its permissible

uses. For example, Austin argues that a request to change zoning from residential to agricultural or commercial is the only type of change that constitutes "rezoning" or "zoning amendment" under the statute. This court recognizes that the Woodsonia West Development application is a far cry from a traditional rezoning request.

The Subject Property is currently—and has been for decades—zoned PUDMR, and Austin's Woodsonia West Development complies with the permitted uses of PUDMR zoning. Moreover, the City has previously approved multi-family residential developments on the Subject Property. The issue here is not the *type* of development— such as residential, agricultural, or commercial—but the *scope*. Although this court recognizes the distinction, it must determine whether state law permits the City to treat applications for multi-family residential planned use developments as rezoning or zoning amendments.

The enabling statute provides that cities and counties may enact "planning and zoning laws and regulations . . . for the protection of the public health, safety and welfare" and that it "is not intended to prevent the enactment or enforcement of additional laws and regulations on the same subject which are not in conflict" with the statute. K.S.A. 12-741(a). This means that cities and counties have broad discretion to enact and enforce zoning regulations so long as they do not conflict with state zoning statutes. K.S.A. 12-741(a); K.S.A. 12-755(a)*; 143rd Street Investors v. Board of Johnson County Comm'rs*, 292 Kan. 690, 707-08, 259 P.3d 644 (2011). Therefore, the City's zoning ordinances are invalid only if they conflict with state zoning statutes. *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, 939, 218 P.3d 400 (2009); *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, 1033, 181 P.3d 549 (2008).

Cities and counties "may adopt *zoning regulations* which may include, but not limited to, provisions which . . . [p]rovide for planned unit developments." (Emphasis added.) K.S.A. 12-755(a)(1). The phrase "zoning regulations" is defined as "lawfully

12

adopted zoning ordinances of a city and the lawfully adopted zoning resolutions of a county." K.S.A. 12-742(a)(11). "Zoning" is defined as "the regulation or restriction of the location and uses of buildings and uses of land." K.S.A. 12-742(a)(10). The plain, unambiguous language of the statutes permits the City to adopt ordinances that "[p]rovide for planned unit developments" and regulate or restrict the location or use of buildings and land within planned unit developments. See K.S.A. 12-755(a)(1). However, some might argue that this case relates to the amendment or change of a planned unit development, not the *provision* of one, because the Subject Property has previously been approved for a multi-family residential planned unit development.

So this court must analyze the process for zoning changes—or changes to "the regulation or restriction of the location and uses of buildings and uses of land." The state statute permits the City to "supplement, change or generally revise the boundaries or regulations contained in *zoning regulations by amendment.*" (Emphasis added.) K.S.A. 12-757(a). After adopting such zoning regulations, they may be amended through procedures initiated by the governing body, or "[i]f such *proposed amendment* is not a general revision of the existing regulations and affects specific property, the amendment may be initiated by *application of the owner of property affected*." (Emphases added.) K.S.A. 12-757(a). So, as here, where a property owner wants to amend the zoning—that is, change the "regulation or restriction of the location and uses of buildings and uses of land"—the City may adopt ordinances that govern such amendment.

When the statutes are read together and given their plain, ordinary meaning, they do not prohibit the City from considering an application for multi-family residential planned unit developments—such as the Woodsonia West Development—as a proposal for rezoning or a zoning amendment governed by K.S.A. 12-757. Not only is this finding consistent with the plain language of the statute, but it is also consistent with Kansas Supreme Court precedent applying K.S.A. 12-757(d) to requests for special use permits (SUP) and conditional use permits (CUP). See, e.g., *Manly v. City of Shawnee*, 287 Kan.

13

63, 67-68, 194 P.3d 1 (2008); *Crumbaker v. Hunt Midwest Mining, Inc.*, 275 Kan. 873, 886-87, 69 P.3d 601 (2003). Neither a CUP nor SUP involves the limited type of rezoning that Austin claims is required before the City may apply the provisions of K.S.A. 12-757, which demonstrates the breadth of what the court considers a zoning amendment.

B. *The City is not prohibited from allowing neighbors to file protest petitions to applications for multi-family residential planned unit developments.*

Having found that the City has the authority to treat PUDMR applications as requests for rezoning or zoning amendments, this court must determine whether the City may also apply the protest petition process to PUDMR applications. The state protest petition statute provides:

"[W]hether or not the planning commission approves or disapproves a *zoning amendment*, if a protest petition *against such amendment* is filed in the office of the city clerk or the county clerk within 14 days after the date of the conclusion of the public hearing pursuant to the publication notice, signed by the owners of record of 20% or more of any real property proposed to be rezoned or by the owners of record of 20% or more of the total real property within the area required to be notified by this act of the *proposed rezoning* of a specific property, excluding streets and public ways and property excluded pursuant to paragraph (2) of this subsection, *the ordinance or resolution adopting such amendment shall not be passed except by at least a 3/4 vote of all of the members of the governing body*." (Emphases added.) K.S.A. 12-757(f)(1).

The City adopted the provisions of K.S.A. 12-757(f)(1) in its Municipal Code of Ordinances, which provides in pertinent part:

"Regardless of whether or not the Planning Commission approves or disapproves a proposed *zoning amendment* or fails to recommend, if a protest petition against such amendment is filed in the office of the City Clerk . . . the ordinance shall not be passed

14

except by at least three-fourths (3/4) vote of all of the members of the Governing Body."
(Emphasis added.) S.M.O. § 17.92.030(E)(6).

The City's protest petition ordinance mirrors the state statute. Thus, if the state statute does not prohibit protest petitions under these circumstances, then the City's protest petition ordinance applies to PUDMR applications like the Woodsonia West Development. See *Genesis Health Club*, 285 Kan. at 1033.

Under K.S.A. 12-757(f)(1), protest petitions are permitted when there is "property proposed to be rezoned." Nothing in this subsection changes the meaning of the phrases "zoning amendment" or "rezone" as used elsewhere in the statute. As explained above, there is not statutory language prohibiting the City from treating PUDMR applications as zoning amendments or rezoning proposals. Additionally, through dicta in *Crumbaker*, the Kansas Supreme Court presumed the protest provision in K.S.A. 12-757(f)(1) applied to the application for a special use permit. 275 Kan. at 887. Although this is merely dicta, the Kansas Supreme Court has not indicated an intent to deviate from that stance or this court's interpretation of that language. Therefore, the City is not prohibited from adopting ordinances that apply the protest provisions of K.S.A. 12-757(f)(1) to multi-family residential planned unit development applications like the Woodsonia West Development.

The City did not violate Austin's due process rights by creating ordinances that incorporated the zoning amendment requirements in K.S.A. 12-757(d) and (f) to PUDMR applications.

15

C.     *The City did not violate K.S.A. 12-757(d) when it failed to approve Austin's Woodsonia West Development pursuant to K.S.A. 12-757(f).*

Having found the City has the authority to treat PUDMR applications as zoning amendments under K.S.A. 12-757(d), and likewise that the City may provide for protest petitions against those applications under the procedures in K.S.A. 12-757(f)(1), this court must determine whether the City exercised its authority in accordance with those statutes. What follows when a zoning amendment fails to garner the requisite 3/4 majority vote for approval in the face of a valid protest petition appears to be a matter of first impression for this court.

The parties apparently agree that when the Planning Commission recommends a proposed zoning amendment to the City Council and no protest petition has been filed, K.S.A. 12-757(d) requires the City Council to either adopt or override the Planning Commission's recommendation or return the recommendation with an explanation of why it failed to adopt or override. K.S.A. 12-757(d). But they disagree about what is required when neighbors file a valid protest petition against the proposed zoning amendment—as is the case here. Austin claims that, after the City failed to approve its application by a 3/4 majority vote, the City was still required to either override the Planning Commission's recommendation by a two-thirds (2/3) vote or return the application to the Planning Commission "with a statement specifying the basis for the governing body's failure to approve or disapprove." K.S.A. 12-757(d). The City disagrees, and argues that because neighbors filed a valid protest petition under K.S.A. 12-757(f), the City was relieved of the requirements in K.S.A. 12-757(d) to override or return the application to the Planning Commission. Essentially, the City argues that if it receives a valid protest petition to a zoning amendment, the application must either be approved by a 3/4 majority or it is automatically denied with no further steps required.

16

Unlike K.S.A. 12-757(d), the protest petition statute contains no process for situations when the City fails to approve a protested zoning amendment. See K.S.A. 12-757(f). When neighbors file a protest petition, K.S.A. 12-757(f) provides that:

"[W]hether or not the planning commission approves or disapproves a zoning amendment, if a protest petition against such amendment is filed . . . the ordinance or resolution adopting such amendment shall not be passed except by at least a 3/4 vote of all the members of the governing body." K.S.A. 12-757(f)(1).

The parties disagree on whether and how K.S.A. 12-757(d) and K.S.A. 12-757(f) work together.

This court cannot consider subsection (d) in isolation. Rather, the various provisions of the statute must be considered together to bring the result "into workable harmony, if possible." *Roe*, 317 Kan. 1, Syl. ¶ 3. Typically, "when statutory provisions are in conflict, the more specific provision generally prevails." *Bruce v. Kelly*, 316 Kan. 218, 255, 514 P.3d 1007 (2022). Here, subsection (f) specifically applies to the approval process for proposed zoning amendments under the less-common circumstance when neighbors file a valid protest petition. Therefore, subsection (f) is the more specific provision and thus, when applicable, controls over subsection (d).

However, when applying these rules of construction, there is a gap in the process. If subsection (f) applies, the governing body can only approve the proposed amendment with a 3/4 majority vote but, unlike the process in subsection (d) when there is no protest petition, subsection (f) does not require the governing body to override the Planning Commission's recommendation or explain its reasons for failing to approve the proposed amendment. Moreover, the statute does not explicitly provide that the City's failure to approve the proposed zoning amendment over a valid protest petition would result in an outright denial of the application and therefore terminate the process.

17

Austin points to this lack of resolution as a problem with the City's interpretation of the statute. Austin argues the heightened voting requirement in subsection (f)—requiring approval by a 3/4 majority—should merely supplement the simple majority required for approval in subsection (d) rather than supplant subsection (d)'s requirements altogether. Austin's interpretation would mean that when the City fails to adopt the Planning Commission's recommendation to approve a protested zoning amendment by a 3/4 majority, the City would still need to either override the Planning Commission's recommendation by 2/3 majority or return the proposed amendment to the Planning Commission with an explanation for its failure to approve or override. While that seems reasonable—particularly because subsection (f) simply increases the required votes for approval but includes no other limitations—this court must determine whether that was the Legislature's intent.

Hypothetically if neighbors had not filed a protest petition and the City still failed to approve the Woodsonia West Development or override the Planning Commission's approval recommendation, the City would have to return the application to the Planning Commission with an explanation for the failure to adopt or override. In that situation, the Planning Commission would have a second chance to resubmit the Woodsonia West Development (with or without changes) to the City Council for passage by a simple majority vote. K.S.A. 12-757(d). The statute provides:

> "If the governing body returns the planning commission's recommendation, the planning commission, after considering the same, may resubmit its original recommendation giving the reasons therefor or submit new and amended recommendation. Upon the receipt of such recommendation, *the governing body, by a simple majority thereof, may adopt or may revise or amend and adopt such recommendation by the respective ordinance or resolution, or it need take no further action thereon.* If the planning commission fails to deliver its recommendation to the governing body following the planning commission's next regular meeting after receipt of the governing body's report, the governing body shall consider such course of inaction on the part of the planning

18

commission as a resubmission of the original recommendation and proceed accordingly. The proposed rezoning shall become effective upon publication of the respective adopting ordinance or resolution." (Emphasis added.) K.S.A. 12-757(d).

If this court reads subsection (f) as Austin proposes—i.e., to simply increase the required vote for approval in subsection (d) from a simple majority to a 3/4 supermajority—the City's failure to approve or override could result in applicants receiving a second attempt at approval by only a simple majority. After receiving a resubmitted application, whether changed from the original or not, the City Council may then approve it by a simple majority or "take no further action." K.S.A. 12-757(d). In other words, under Austin's interpretation of the statute, even when neighbors file a valid protest petition, the heightened voting requirement would not apply to the second attempt at approval. This "loophole" in the statutory scheme could allow applicants to effectively circumvent the heightened voting requirement triggered by a valid protest petition.

While it appears that neighbors could file a second protest petition on the next attempt, this result could create an endless loop. In that endless loop, neighbors would carry a heavy burden to refile protest petitions each time the Planning Commission resubmits the proposed zoning amendment to the City Council, even if unaltered from the original application that failed to receive the requisite 3/4 majority approval. It is conceivable that litigants could strategically use this process to obtain approval for protested amendments by a simple majority. By requiring a 3/4 majority to approve zoning amendments after neighbors have filed a valid protest petition, the Legislature expressed a clear intent that protested zoning not be approved by a simple majority vote.

Because neighbors filed a valid protest petition against the Woodsonia West Development pursuant to K.S.A. 12-757(f), the City Council could only approve the development by a 3/4 majority vote. The City Council's failure to achieve the 3/4

19

majority vote needed for approval resulted in the application's denial, and the processes for resubmission of failed zoning amendments in K.S.A. 12-757(d) are inapplicable.

II. THE CITY COUNCIL DID NOT ACT UNREASONABLY WHEN IT FAILED TO APPROVE THE WOODSONIA WEST DEVELOPMENT.

Austin claims the City unreasonably failed to approve the Woodsonia West Development because:

(1) the councilmembers did not provide a sufficient explanation on the record for their decision;
(2) the councilmembers prejudged the proposal;
(3) the *Golden* factors weighed in favor of approval;
(4) the City had previously approved similar development plans on the Subject Property; and
(5) the City's denial was based on an improper plebiscite of the neighbors.

The Kansas Judicial Review Act (KJRA) does not provide for judicial review of city zoning decisions, but "any person aggrieved" by a zoning decision may bring an action "to determine the reasonableness of such final decision." K.S.A. 12-760(a); *Frick v. City of Salina*, 289 Kan. 1, 10, 208 P.3d 739 (2009) ("[T]he KJRA does not apply to the actions of cities, counties, or other political subdivisions of the state."). At the first step of judicial review, the district court reviews the zoning decision for reasonableness. The district court's decision is then appealable to this court, which "must make the same review of the zoning authority's action as did the district court." *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980). "The standard for review of an order denying or granting a zoning change is whether the order entered is reasonable." *Golden v. City of Overland Park*, 224 Kan. 591, Syl. ¶ 5, 584 P.2d 130 (1978).

20

Courts give broad deference to zoning authorities in determining whether to grant or deny zoning amendments or rezoning requests. The scope of this court's review is "limited to determining (a) the lawfulness of the action taken, and (b) the reasonableness of such action," and this court must presume the zoning authority acted reasonably. *Combined Investment Co.*, 227 Kan. at 28. This court gives no deference to the district court's determination as to whether the zoning authority's actions were reasonable, because "[w]hether action is reasonable or not is a question of law, to be determined upon the basis of the facts which were presented to the zoning authority." 227 Kan. at 28. A zoning authority's "[a]ction is unreasonable when it is so arbitrary that it can be said it was taken without regard to the benefit or harm involved to the community at large, including all interested parties, and was so wide of the mark that its unreasonableness lies outside the realm of fair debate." 227 Kan. at 28.

Zoning authorities should consider the *Golden* factors when deciding whether to approve a proposed zoning amendment:

(1) The character of the neighborhood;

(2) the zoning and uses of properties nearby;

(3) the suitability of the Subject Property for the uses to which it has been restricted;

(4) the extent to which removal of the restrictions will detrimentally affect nearby property;

(5) the length of time the Subject Property has remained vacant as zoned;

(6) the relative gain to the public health, safety, and welfare by the destruction of the value of plaintiff's property as compared to the hardship imposed upon the individual landowner;

(7) the recommendations of permanent or professional staff; and

(8) the conformity of the requested change to the adopted or recognized master plan being used by the city. See *Golden*, 224 Kan. at 598.

21

Kansas appellate courts have repeatedly reaffirmed the importance of the *Golden* factors in evaluating the reasonableness of a zoning authority's decision. See, e.g., *143rd Street Investors*, 292 Kan. 690, Syl. ¶ 3 ("Zoning authorities should consider the nonexclusive factors established in [*Golden*], other relevant factors, and the zoning authority's own comprehensive plan when acting on an application for rezoning."); *Zimmerman*, 289 Kan. at 945-46; *Manly*, 287 Kan. 63, Syl. ¶ 5 ("When considering zoning matters, a governing body should consider the factors set forth in [*Golden*]."); *McPherson Landfill, Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, Syl. ¶ 3, 49 P.3d 522 (2002); *Johnson County Water Dist. No. 1 v. City of Kansas City*, 255 Kan. 183, 184, 871 P.2d 1256 (1994); *Davis v. City of Leavenworth*, 247 Kan. 486, 493, 802 P.2d 494 (1990); *Landau v. City Council of Overland Park*, 244 Kan. 257, 261-62, 767 P.2d 1290 (1989); *Taco Bell v. City of Mission*, 234 Kan. 879, Syl. ¶ 5, 678 P.2d 133 (1984).

A. *The City Council created a minimally sufficient record of the reasons it failed to approve the Woodsonia West Development.*

As far back as the original enumeration of the *Golden* factors, the Kansas Supreme Court has admonished zoning authorities to "place in their minutes a written order summarizing the evidence and stating the factors which were considered in reaching the decision either to deny or to grant a requested zoning change." *Golden*, 224 Kan. 591, Syl. ¶ 4; *Davis*, 247 Kan. at 493; *Zimmerman*, 289 Kan. 926, Syl. ¶ 11. This is because "[a] mere yes or no vote upon a motion to grant or deny leaves a reviewing court, be it trial or appellate, in a quandary as to why or on what basis the board took its action." *Golden*, 224 Kan. at 597. While reasonableness remains the standard, that reasonableness is "more readily, more effectively, and more uniformly applied if zoning bodies will place in their minutes a written order delineating the evidence and the factors the board considered in arriving at its conclusion." *Golden*, 224 Kan. at 599. Although not required, the Kansas Supreme Court has "strongly encouraged" zoning authorities "to make formal

22

findings of fact concerning its decisions regulating land use." *Zimmerman*, 289 Kan. 926, Syl. ¶ 11.

During City Council meetings, some of the councilmembers expressed concerns about the Woodsonia West Development's impact on the character, density, and traffic of the existing neighborhood. Councilmember Larson-Bunnell discussed the large number of neighbors, both residential and commercial, who opposed the development and noted neighbors' concerns "about the potential for increased crime, overcrowded schools, and decreased property values" but further stated, "I really haven't seen strong data to support these concerns and my decision tonight is not based on those factors." Councilmember Larson-Bunnell identified traffic concerns, specifically the number of cars during the morning and evening commute, the increased likelihood of danger through the roundabouts on Johnson Drive, the safety of the proposed exits to get to 47th Street, and the likelihood of an increase in traffic cutting through the Woodsonia neighborhood. The councilmember further explained, "On the whole, these traffic concerns are valid and there is a direct correlation between the number of units in the proposed development and the impact to traffic." Finally, Councilmember Larson-Bunnell expressed concern about the size of the proposed buildings detracting from the character of the neighborhood.

Councilmember Jenkins explained that the original neighbors were there first and that "gives [them] certain additional rights." Councilmember Jenkins also said, "I don't think this development fits the characteristics of the neighborhood it's being built next to." Councilmember Jenkins noted the proposed development would have buildings that "tower, literally tower over this [existing] development," and "I'm having trouble with the, like I say, the density of this project." Councilmember Jenkins also pointed to increased traffic, although noting that the traffic study showed it would stay "within reason." Councilmember Meyer expressed concerns "about the buffer, particularly on that north side and then what the traffic concerns would look like."

23

During the December 23, 2019 City Council meeting, only Councilmember Jenkins expressed concerns on the record. The councilmember's concerns mimicked those expressed during the first meeting about the development's density and character arising from having taller buildings in a smaller space than was previously approved. Councilmember Jenkins explained, "[W]e get these bigger buildings and that's what's causing the problem here that people are concerned about. And I have those same concerns because everybody says it meets the *Golden* rule test. No, it doesn't. It negatively affects the neighborhood, the character of the neighborhood." Councilmember Jenkins explained that, after reading emails from concerned neighbors, there was an "underlying concern that the density is too great."

After the City Council failed to approve the Woodsonia West Development, Austin initiated litigation and deposed the disapproving councilmembers. While the district court did not rely on the deposition testimony, its inclusion in the record is not an error and the court may inquire into the facts or factors the councilmembers considered when making their decision. While not necessary, the parties agree that such an inquiry would be helpful in this case and for that reason this court will consider the deposition testimony only to the extent it informs the court of the councilmembers' reasons for opposing Austin's application. See *Landau*, 244 Kan. at 261 (permitting limited discovery into the facts or factors considered in the rezoning decision).

Councilmember Larson-Bunnell testified that traffic was a concern, particularly at two intersections, although the councilmember did not question the sufficiency of the road capacity but was more concerned about the "experiences that impact our residents day to day." Councilmember Larson-Bunnell testified that the neighbors' concerns were given consideration and that they identified concerns that she shared.

Councilmember Jenkins testified that his "big issue was density." Councilmember Jenkins noted that the Subject Property had been reduced from about 44 acres to 29 acres,

24

but the Woodsonia West Development nevertheless "tried to put in basically the same size development" as was previously approved. Councilmember Jenkins also discussed damage to "the character of the neighborhood" associated with the proposed building elevations compared to the adjacent neighborhood and the neighbors' related concerns. The neighbors' concerns about density "paralleled closely to" Councilmember Jenkins' concerns. Jenkins relied on his personal experience, a "gut feeling based on years and years of experience," common sense about human behavior, and the "comments from the individuals that live in the area and what their current situation is and their extrapolation as to what they anticipated the additional traffic to cause."

Although Councilmember Kemmling expressed no concerns during the public City Council meetings, he testified at his deposition that the "[t]he density of the plan caused me concern." Additionally, Councilmember Kemmling believed the Woodsonia West Development failed to meet the Future Land Use Guide even though the Planning Commission found that it met the City's Comprehensive Plan for future land use. Councilmember Kemmling also thought the height of the buildings "would be fairly imposing to the surrounding structures," which would not match the existing character of the neighborhood. The likely increase in traffic cutting through the Woodsonia neighborhood, as well as problems with parking, also concerned Councilmember Kemmling. Councilmember Kemmling further testified that neighbors "raised a lot of concerns which were concerns of mine as well that I heard at that meeting."

Finally, Councilmember Meyer testified that she was concerned about the density, traffic, and lack of an adequate buffer zone between the "single-family homes and the high-density apartment buildings." Her specific traffic concerns related to the roundabouts getting backed up at certain intersections. Councilmember Meyer acknowledged the Planning Commission's approval but disagreed with their determination. The councilmember explained that those disagreements were based on experience looking at a lot of development plans and "living very near that site, it's a

25

place that I sort of drive by the intersection every day" and "it's a pretty congested single-family neighborhood."

While some of the councilmembers referred to the *Golden* factors or a particular factor, the record would have benefited greatly if the councilmembers had specifically identified the factors considered. This panel joins the numerous previous panels of this court, and the Kansas Supreme Court, in cautioning zoning authorities to take care in their quasi-judicial role to create a record enabling review and lending credibility to the process. See, e.g., *Johnson County*, 255 Kan. at 184-85; *Sechrest v. City of Andover*, No. 118,052, 2018 WL 4655611, at *6-7 (Kan. App. 2018) (unpublished opinion) (zoning authority failed to explain concerns about small zoning amendment).

However, this failure does not render the City Council's decision per se unreasonable. See *Landau*, 244 Kan. at 263 (finding the zoning authority's failure to address the *Golden* factors did not prevent review). Austin contends the councilmembers' stated concerns are not supported by evidence, but that is a different issue than whether the record is sufficient to allow for judicial review of the City Council's decision. The answer to the latter question is yes. Under the circumstances here, where neighbors filed a valid protest petition and the City Council failed to reach the 3/4 majority necessary for approval, the information in the record permits appellate review of the City's zoning decision. See, e.g., *Board of Johnson County Comm'rs v. City of Olathe*, 263 Kan. 667, 679, 952 P.2d 1302 (1998); see also *Landau*, 244 Kan. 257, Syl. ¶ 7 ("The trial court may take additional evidence in a zoning appeal where the evidence is relevant to the issue of reasonableness of the zoning decision.").

B. *The councilmembers' failure to approve the Woodsonia West Development was not unreasonable under the* Golden *factors.*

In an exceedingly succinct overview, the district court concluded the City's decision was reasonable without evaluating the *Golden* factors, or any specific factors. While this court's review is conducted anew, there is no doubt the process benefits when the district court conducts its own independent analysis. Both parties have cradled their arguments in the fabric of the *Golden* factors, and although the City Council did not go through each *Golden* factor and the district court chose not to elaborate on the factors, this court finds no error in analyzing reasonableness in light of the *Golden* factors as the parties have presented. As the court explained in *McPherson*, the following analysis of each *Golden* factor "should not be viewed as reweighing of the evidence, but, rather, a process of pointing out how the [zoning authority's] findings of facts were reasonable in light of the record on appeal." 274 Kan. at 331.

The range of reasonableness in zoning decisions is quite broad, and one single factor—whether a *Golden* factor or not—might weigh so heavily in support of a zoning authority's decision that it outweighs multiple factors in opposition. See, e.g., *Zimmerman*, 289 Kan. at 951-52.

In *Zimmerman*, the appealing intervenors argued that "either the amount of the evidence presented in support" of the Board's decision or "the arguably greater amount of evidence presented in opposition to" the Board's decision warranted reversal. 289 Kan. at 956. The court explained it could not simply reweigh the evidence but could only determine "whether the given facts could reasonably have been found by the Board to justify its decision." 289 Kan. at 956. The question is not whether more or better evidence supported a decision contrary to the zoning authority's, but whether the zoning authority had a reasonable basis for its decision.

27

The City's failure to approve the Woodsonia West Development is unreasonable only if it was "taken without regard to the benefit or harm" to the community. *Combined Investment Co.*, 227 Kan. at 28. This court may not reverse a zoning authority's decision merely because a great weight of the evidence supports a contrary outcome. See, e.g., *Zimmerman*, 289 Kan. at 956-57. The landowner objecting to the zoning authority's decision "has the burden of proving unreasonableness by a preponderance of the evidence." *Combined Investment Co*., 227 Kan. at 28.

### 1. *The Character of the Neighborhood*

Several councilmembers cited concerns about how the Woodsonia West Development would impact the character of the neighborhood, and this seems to be the reason most heavily relied upon for denying Austin's application. Specifically, they expressed concerns about the height of the proposed apartment buildings, the population density, and how the density would impact traffic. Austin argues it presented evidence that these concerns are unfounded. Even still, Austin's evidence does not demonstrate that the councilmembers' concerns about character were "'so wide of the mark'" that the "'unreasonableness lies outside the realm of fair debate.'" *Golden*, 224 Kan. at 596.

Specifically, it is undisputed that the proposed three-story apartment buildings in the Woodsonia West Development would be taller than neighboring houses. Austin argues that the apartment buildings would be built on a lower elevation making the height less noticeable and minimizing the visual impact of the height difference but has provided no evidence of that contention. Would the lower elevation make the apartment buildings look more like two stories? This court cannot say that the councilmembers' concern about the apartment building height marring the neighborhood's character is unreasonable.

Additionally, Austin argues that the proposed density is within the City's Comprehensive Plan and the traffic studies show the traffic impact would be de minimis. But it is undisputed that the Woodsonia West Development's proposed density is higher than the surrounding neighborhood and previously approved developments and would thus naturally increase traffic in the area. While the court in *Taco Bell* cautioned authorities against relying on general traffic concerns to deny a zoning amendment, that admonition is inapplicable to this case. In *Taco Bell*, the governing body refused to rezone a property located on Johnson Drive (a four-lane highway) from an automobile service station to a drive-thru window restaurant and cited increased traffic as a concern. *Taco Bell,* 234 Kan. at 880-81. Unlike here, the property at issue in *Taco Bell* was immediately adjacent to two food establishments. 234 Kan. at 881. The City denied the request and voted to "down zone" the area to office use only, and the district court found the City's actions arbitrary. 234 Kan. at 881-82.

On appeal, the Kansas Supreme Court analyzed the *Golden* factors and found the City's conclusion that the proposed drive-thru restaurant would disrupt the peace and quiet of the area unreasonable, "as if there were no other commercial activity nearby." *Taco Bell*, 234 Kan. at 888-89. The court noted that the existing adjacent residential property "would not be harmed by the addition of the Taco Bell as compared to all the other retail businesses" that were already adjacent to the residential property. 234 Kan. at 888. Taco Bell anticipated the existing 20,000 daily vehicles traveling on Johnson Drive would become its customers, and there was no evidence that the addition of a drive-thru restaurant would have any meaningful effect on the already-copious existing traffic.

Here, the Woodsonia West Development differs from the character of the adjacent single-family neighborhood. While the density might be just within the City's Comprehensive Plan, it is significantly higher than the nearby neighborhood and any previously approved developments for the Subject Property. The Woodsonia West Development includes about 413 total units, and the highest number of units previously

29

approved for the Subject Property was 398 in 1996. The unit increase from 398 to 413 might seem insignificant, but the Subject Property is currently about 15 acres smaller than its size 1996 size. Therefore, the development approved in 1996 had a density of 8.9 du/acre, while the Woodsonia West Development has a density of 14.1 du/acre. Moreover, the previously approved plans included a larger percentage of townhomes than the Woodsonia West Development. It was not unreasonable for the councilmembers to conclude that having more apartment units—and thus more residents—in a smaller area than any previously approved development would create an increase in traffic that impairs the character of the existing neighborhood.

Austin argues that the councilmembers' concerns about neighborhood character are merely excuses masking a prejudice against apartment buildings or other multi-family housing. This court's opinion should not be read to conclude that multi-family residential developments are per se of such a distinct character compared to single-family residential neighborhoods making any denial of such developments reasonable. The councilmembers' concerns about how the development's density and apartment building height, which also create more specific concerns about traffic and the buffer zone between the higher-density apartments and the existing neighborhood, impact the neighborhood character and aesthetic are not so wide of the mark as to be unreasonable. See *Landau*, 244 Kan. 257, Syl. ¶ 3 (appellate review of zoning decisions is limited to determining reasonableness); see also *Zimmerman*, 289 Kan. at 951-52 (explaining that zoning authorities may consider aesthetics in zoning decisions and that some considerations may outweigh other *Golden* factors). Additional traffic concerns are addressed more specifically below.

2. *The Zoning and Uses of Properties Nearby*

The Subject Property is currently zoned PUDMR, and the City has previously

approved multi-family residential developments for the Subject Property. While the Woodsonia West Development technically fits within the zoning requirements for PUDMR, not all multi-family residential planned unit developments are created equal. Zoning authorities may consider how the development's specific characteristics fit within the zoning and uses for the existing property.

By failing to approve the Woodsonia West Development, the City has not restricted Austin's ability to use the Subject Property for a different multi-family residential planned unit development, including apartment buildings. The councilmembers' specific concerns about how the density, traffic, and buffer zone affect nearby property uses mirror the concerns about how the development impacts the neighborhood's character. However, the councilmembers failed to specifically explain how those concerns negatively impact the zoning and use of nearby properties. But the City Council's decision is presumed to be reasonable, and Austin carries the burden to prove its proposed development's density and buffer zone will not harm the use of nearby property. Even without more specifics, this court cannot say the councilmembers' concerns about the Woodsonia West Development's impact on nearby property uses were unreasonable. See *Taco Bell*, 234 Kan. at 878-88 (finding the zoning authority's concerns speculative).

3. *The Suitability of the Subject Property for the Uses to Which It Has Been Restricted*

Under this factor, the court evaluates whether the City's denial of the Woodsonia West Development leaves Austin with other suitable uses for the Subject Property. This situation is unique because neither party seeks to change how the Subject Property may be used or to restrict or permit a particular use. By refusing to approve the Woodsonia West Development, the City has not prohibited a future similar development on the Subject Property. Rather, the Subject Property has been and remains zoned PUDMR—

suitable for a multi-family residential planned unit development, including apartment complexes.

As explained below, the City concedes that the Woodsonia West Development comports with the City's Comprehensive Plan, and the councilmembers did not suggest suitable alternative uses for the Subject Property. See *McPherson,* 274 Kan. at 325 (evaluating alternative uses for the property when the requested use was denied). The City argues its prior approval of developments on the Subject Property sufficiently demonstrates there are other suitable PUDMR uses for the Subject Property. Yet it has been about 20 years since the City last approved a multi-family residential development on the Subject Property.

Although the City has not technically further restricted the Subject Property prohibiting future multi-family residential planned unit developments, it has also not identified what criteria would make Austin's future application suitable for the Subject Property. But while such a discussion may have been helpful to provide Austin direction for future applications, the absence of that discussion did not invalidate or render unreasonable the City's denial of Austin's current application.

4. *The Extent to Which Removal of the Restrictions (i.e., Approval of the Woodsonia West Development) Will Detrimentally Affect Nearby Property*

Although the City Council did not create a report identifying how they believed the Woodsonia West Development would detrimentally affect nearby property, the councilmembers identified traffic, school overcrowding, and density as reasons for their votes against approving Austin's application. While some of these concerns also related to the neighborhood's character, this court will also analyze the detrimental effect unrelated to the impact on character.

32

### i.    *Density*

As explained above, the Woodsonia West Development's density of 14.1 du/acre, as amended, was higher than the density of any previously approved development on the Subject Property. Even so, the Planning Commission's staff Report states that the Woodsonia West Development's density is lower than another nearby development and within the range contemplated by the City's Comprehensive Plan. While councilmembers identified density as a concern, they did not explain how that density level would detrimentally affect nearby property beyond traffic and school overcrowding.

This court therefore analyzes the councilmembers' concerns about density related to their expressed concerns about school capacity and traffic safety and service.

### ii.    *School Capacity*

Neighbors expressed generalized concerns that the Woodsonia West Development would cause school overcrowding, but it does not appear the councilmembers relied on those generalized concerns in voting against the application's approval. Although Councilmember Kemmling's deposition testimony noted the neighbors' concerns about school overcrowding, it was not the primary reason for the councilmember's vote. Councilmember Kemmling did not meet with anyone at the school district about potential overcrowding and cited no evidence, personal experience, or observations that supported the neighbors' generalized concerns about school capacity. No other councilmembers cited concerns about school capacity as a reason for denying the Woodsonia West Development, and Councilmember Larson-Bunnell specifically stated there was no evidence the development would contribute to school crowding and that school capacity was not a consideration in her vote.

33

The City also cites no evidence in its appellate brief supporting the neighbors' generalized concerns that the Woodsonia West Development would negatively impact schools. As explained below, "[z]oning is not to be based upon a plebiscite of the neighbors." *Zimmerman*, 289 Kan. 926, Syl. ¶ 7. The school district reported that there was ample capacity to absorb additional students that may result from the Woodsonia West Development. With knowledge of the current standards and outgoing/incoming students, the school district is uniquely qualified to determine its ability to accept additional students related to teacher/student ratios and building capacity for the area schools. No councilmembers challenged or contradicted the school district's contention about its capacity to absorb additional students from the Woodsonia West Development.

Austin has established by a preponderance of the evidence that it would have been unreasonable for councilmembers to rely on the neighbors' generalized concerns about school capacity. See *143rd Street Investors,* 292 Kan. at 720 (explaining that the landowner must "establish by a preponderance of the evidence that the challenged decision is not reasonable"). However, it does not appear the councilmembers relied on their personal concerns or the neighbors' generalized concerns about school capacity in not approving the development. Thus, the neighbors' unsubstantiated concerns regarding school capacity have no bearing on the reasonableness of the City's denial of that application.

iii. *Traffic*

Multiple councilmembers identified specific concerns about increased traffic during busy commute times, particularly at specific intersections, roundabouts, and cut-through areas. Many of these concerns were based on the councilmembers' personal experiences driving and walking in the area. Austin claims the councilmembers' traffic concerns are unreasonable because the Planning Commission's staff Report stated the traffic increase "would have little to no impact on roadway level of service." The City's

34

Traffic Manager explained the overall impact on traffic from the proposed development would be "minor in the overall scheme of the development."

After traffic concerns were identified, the City's staff provided updated information that "Woodsonia Drive, 51st Street, and 53rd Street were all designed and built to a higher collector to facilitate future traffic volumes." The staff Report explained the traffic study showed an additional 190 trips in the morning peak period and an additional 215 trips in the evening peak period, but because the "street network adjacent to the proposed development is currently well under capacity," the additional trips "will have little to no impact on roadway level of service as a result." The staff Report also included charts that showed the signal light time would increase by about 1 second in the morning and half a second in the afternoon. It further showed the service operation level at the controlled stops, including Johnson Drive, Roberts Drive, Woodsonia Drive, and Silverheel Street, would all remain between a B and A.

The City's staff reviewed the traffic modeling reports that showed the traffic increase would not significantly alter the commute time or roadway safety of the existing neighbors. Some councilmembers questioned the accuracy of these findings but they did not identify any inaccuracies in the traffic reports or present contradicting evidence.

However, unlike the school capacity issue, it is undisputed that the Woodsonia West Development would increase traffic in the area. The councilmembers cited their personal experiences in the area for why they believed the traffic increase caused concern for neighboring property. While generalized traffic concerns are not a reasonable basis for denial, the councilmembers' personal and shared experiences with the traffic patterns and practices at specific intersections that were not addressed by the traffic models are more than generalized traffic concerns. See *Taco Bell*, 234 Kan. at 887-88 (general traffic concerns about a potential drive-thru restaurant in a commercial area near other restaurants were not reasonable). For example, Councilmember Larson-Bunnell identified

35

the difficulty of the angle at Silverheel Street and 47th Street as a particular concern, and while that issue is apparently known to the City, there is no plan to address it in the near future. While the City staff explained that the area operated "in a reasonably safe manner" when it was used as a detour about a decade earlier, this court cannot say such an explanation so definitively satisfied the councilmembers' concerns as to make them unreasonable. Moreover, Austin did not address the specific concern about people cutting through the existing Woodsonia neighborhood. Austin relies on the traffic studies and models, but those did not address the councilmembers' observations about the current issues of people maneuvering the roundabouts or the increase in people cutting through the existing neighborhood.

The councilmembers provided no additional basis for their expressed traffic concerns, nor any solution within the PUDMR zoning or the City's Comprehensive Plan, but the issue still lies in the realm of fair debate. There will be an objective increase in traffic, and this court will not substitute its personal experience and judgment regarding the traffic study for that of the councilmembers'. See, e.g., *McPherson*, 274 Kan. at 330 (noting the zoning authority's decision was not "so wide of the mark that the decision lies outside the realm of fair debate"). Austin failed to prove by a preponderance of the evidence that the councilmembers' concerns about the effect of the traffic increase on specific intersections, roundabouts, and people cutting through the existing neighborhood were unreasonable.

5. *The Length of Time the Subject Property Has Remained Vacant as Zoned*

On one hand, the Subject Property has been zoned for multi-family residential planned unit development for almost 30 years without being developed. On the other hand, the City has previously approved multi-family residential planned unit developments on the Subject Property, but the last approval was about 20 years ago.

36

Austin has not shown that the City will refuse all future multi-family residential developments on the Subject Property, thus leaving it unused or underutilized. But the City has provided no guidance on how Austin could obtain future approval. On the whole, this factor is not of primary importance to assessing the reasonableness of the City's denial of Austin's application. See *Landau*, 244 Kan. at 267 (finding this factor unpersuasive before the surrounding area had been developed when there was no evidence of inability to develop the area).

6. *The Relative Gain to the Public Health, Safety, and Welfare by the Possible Destruction of the Value of Austin's Property as Compared to the Hardship Imposed on the Individual Landowner*

Austin claims that it has been "significantly harmed by its inability to move forward" with the Woodsonia West Development but has failed to include evidence supporting that contention. Additionally, Austin has provided no evidence that the Woodsonia West Development benefits public health, safety, and welfare. There is no evidence that the proposed development fits the quantity and quality of housing needed in the area. Nor is there evidence that the Subject Property's lack of development harms the public. Likewise, however, the City has not demonstrated that the harm to the individual landowner outweighs the harm to Austin or the public by not approving the Woodsonia West Development. Austin has not shown that this factor has any bearing on the reasonableness of the City's decision.

7. *The Recommendations of Permanent or Professional Staff*

The Planning Commission's staff unanimously and repeatedly approved the Woodsonia West Development. After neighbors expressed concerns about school overcrowding, the City's staff obtained additional information and the school district "provided their methodology used . . . and re-affirmed its original response to school

impact." Additionally, after hearing neighbors' concerns about traffic, the City's staff provided a memorandum with additional explanation about how traffic levels, patterns, and intersections would remain safe. The City's staff also addressed concerns about density by explaining that, since 1995, the City's Comprehensive Plan provides that the Subject Property "has been designated as appropriate for High Density Residential with a narrow sliver of medium density residential for townhomes to buffer single family to the east," which aligns with the Woodsonia West Development. The City's staff also provided the Calamar project as an example of a higher-density project of 17.5 du/acre that is currently under construction with three-story heights.

The City does not cite any independent evidence from traffic experts, school officials, city planning engineers, or other experts that contradict or undermine their staff's overall analysis and conclusions about the Woodsonia West Development. Gut feelings and speculation are not a reasonable basis for concluding the staff's recommendations are incorrect, but the City is also not required to accept the staff's recommendation. *Manly,* 287 Kan. at 70-71 (noting the planning commission "is created to fulfill an advisory function"). The City's staff acts in merely an advisory role, and Austin has not shown that the City's failure to follow the Staff recommendation rendered the City's decision unreasonable.

8. *The Proposal's Conformity to the Adopted or Recognized City Master Plan*

This *Golden* factor ensures that proposed developments align with the City's long-term planning because the "legislature has stressed the making of such plans, and . . . they should not be overlooked when changes in zoning are under consideration." *Golden*, 224 Kan. at 598. The City argues the Woodsonia West Development's density of 14.1 du/acre creates a concern about whether the development fits within the City's Comprehensive Plan. The parties agree the City's Comprehensive Plan designates the Subject Property for

high- and medium-density multi-family residential development. High density is defined as 10-15 du/acre while medium density is defined as 5.01-10 du/acre. The City concedes that the Woodsonia West Development "narrowly fits within the density limits of the Comprehensive Plan." Even still, the City notes that the development has higher density than previously approved developments for the Subject Property, which ranged from 7.2 to 8.9 du/acre.

While it is true that the proposed development's population density fell within the City's Comprehensive Plan, the City is not required to approve every development application that falls within the scope of its Comprehensive Plan. In light of the City councilmembers' other expressed concerns, the fact that councilmembers were concerned that the Woodsonia West Development's density per acre was at the high end of the Comprehensive Plan does not render the City's denial unreasonable.

9. *Overall the City's decision is not unreasonable under the* Golden
*Factors*

The *Golden* factors are meant to assist in evaluating zoning decisions, but reasonableness remains the standard. When evaluating the overall reasonableness of a zoning authority's decision, the *Golden* factors are used as an aid; they are not exclusive, and the importance of each factor may weigh differently depending on the proposal. See *Zimmerman*, 289 Kan. at 951-53 (explaining that a zoning authority may weigh a factor such as aesthetics more heavily than other factors). The *Golden* factors are not exclusive, and "[o]ther factors may and no doubt will be of importance in the individual case." *Golden*, 224 Kan. at 599. Therefore, the "traditional tests of reasonableness were not abandoned but are enhanced by the eight factors which provide a reviewing court with a basis for testing the action of a governing body in a meaningful way." *Taco Bell*, 234 Kan. at 887.

Here, the Woodsonia West Development's impact on the surrounding neighborhood and its character carries a significance that would not be the same if the proposed development were a commercial property surrounded by other commercial properties. See *Taco Bell*, 234 Kan. at 882. While several *Golden* factors may support approval of the Woodsonia West Development, Austin has nevertheless failed to show that the City acted unreasonably. Austin failed to show the councilmembers' concerns about building height, traffic associated with higher density, and the development layout's impact on the character of the existing neighborhood were unreasonable.

This court's review is limited by the governing reasonableness standard, but that standard is not without consequence. Zoning authorities' decisions must be reasonable, and the basis for those decisions must be meaningfully discernable from the record. Given the councilmembers' concerns about traffic, density, height, and buffer zones, Austin has not shown that the City's denial of its application for the Woodsonia West Development was unreasonable.

C. *The councilmembers did not improperly rely on a plebiscite of the neighbors or prejudge the Woodsonia West Development.*

Austin claims that councilmembers improperly prejudged the Woodsonia West Development and denied it based on a plebiscite of the neighbors. Austin alleges that Councilmember Larson-Bunnell prejudged the Woodsonia West Development because she developed notes explaining her opposition before the public City Council meeting. Austin claims bias but cites no personal incentive or benefit to the councilmember.

A zoning authority decisionmaker is not prohibited from forming prejudgments so long as the decisionmaker "maintained an open mind and continued to listen to all the evidence presented before making a final decision." *McPherson*, 274 Kan. at 318. Austin claims that the weight of the evidence supporting the development is sufficient evidence

40

that Councilmember Larson-Bunnell improperly prejudged the proposal. However, as explained above, the City Council's decision was not unreasonable. Moreover, Councilmember Larson-Bunnell did not ignore Austin's evidence. Importantly, Councilmember Larson-Bunnell stated there was not sufficient evidence supporting neighbors' concerns about potential for increased crime, property devaluation, or school overcrowding and her decision was not based on those concerns. Austin failed to show any prejudgment prevented the councilmembers from keeping an open mind and adjusting to evidence presented.

Additionally, this court cannot ignore the potential impact of the nearly universal neighborhood opposition to the Woodsonia West Development. Neighbors filed a protest petition and spoke at the City Council meetings in opposition, citing concerns about traffic, neighborhood character, and school overcrowding, among other things. While the councilmembers who voted to deny the Woodsonia West Development shared some of the concerns expressed by neighbors, this court cannot say the councilmembers abandoned their quasi-judicial responsibility in favor of neighborhood fervor. "Zoning is not to be based upon a plebiscite of the neighbors; neighborhood objections alone are not legally sufficient to support land use regulation. Nevertheless, their views remain a consideration in a governing body's ultimate decision." *Zimmerman*, 289 Kan. 926, Syl. ¶ 7.

Important here, because the neighbors filed a protest petition, the Woodsonia West Development required a 3/4 majority vote to pass. That means Austin needed six of the eight voting councilmembers to gain approval. So, even if Councilmember Kemmling's deposition testimony that he had "questions about or concerns about" school capacity demonstrates that the neighbors' unsupported generalizations "that it's very crowded" at the schools improperly influenced his vote, one additional vote to approve would not have changed the outcome. None of the other councilmembers discussed potential school overcrowding as a reason for their vote to deny.

Zoning authorities need not ignore neighbors' concerns to avoid falling victim to improper influence. In fact, the statutory scheme gives neighbors' concerns weight by requiring a super majority vote for passage of a proposed zoning amendment when a valid protest petition has been filed. See K.S.A. 12-757(f). This demonstrates the Legislature's intent that neighbors' concerns be given thoughtful consideration. Likewise, the fact that councilmembers shared concerns with the neighbors does not demonstrate improper influence. Unlike the facts here, cases cautioning against neighborhood influence often involve a zoning amendment with only a slight change, or a lack of zoning authority reasoning. See *Taco Bell*, 234 Kan. at 891-92 (the zoning request was similar to the existing neighborhood); *Sechrest*, 2018 WL 4655611, at *6-7 (zoning authority failed to explain concerns about small zoning amendment). A zoning authority can and should consider neighbors' concerns and then examine them to determine whether they outweigh the community benefits. See *Waterstradt v. Board of Commissioners*, 203 Kan. 317, Syl. ¶ 3, 454 P.2d 445 (1969).

Austin failed to establish the councilmembers improperly prejudged the Woodsonia West Development to the extent they failed to maintain an open mind before reaching a conclusion or that their decision was based on a plebiscite of the neighbors.

CONCLUSION

The City may enact zoning ordinances that are not inconsistent with state zoning statutes and apply those ordinances to applications for multi-family residential planned unit developments. Austin's challenge to the reasonableness of the City's decision demonstrates the tension between landowners and zoning authorities, particularly in residential zoning cases. Because zoning authorities are encouraged, but not required, to consider the *Golden* factors and create a record of specific reasons for their decisions, it can be difficult for landowners to create development plans that anticipate and alleviate the zoning authority's concerns while achieving the most desired use of their land.

42

Ultimately, this court's review is limited to determining whether the zoning authority acted reasonably—which is presumed. The City provided a minimally sufficient record upon which this court could review its decision, and Austin failed to demonstrate the City's decision was unreasonable.

The district court's grant of summary judgment to the City is therefore affirmed.